# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0359-25

D.M.L.,

    Plaintiff-Respondent,

v.

T.C.,

    Defendant-Appellant.

_____

Submitted July 29, 2026 – Decided August 6, 2026

Before Judges Mayer and Vinci.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Burlington County, Docket No. FV-03-2454-25.

Hegge & Confusione, LLC, attorneys for appellant (Michael Confusione, of counsel and on the brief).

Respondent has not filed a brief.

PER CURIAM

    Defendant T.C. appeals from a July 14, 2025 final restraining order (FRO) entered pursuant to the Prevention of Domestic Violence Act, N.J.S.A. 2C:25-

17 to -35, in favor of plaintiff D.M.L., and a September 5, 2025 order denying her motion for reconsideration.[1] We affirm.

We summarize the facts developed during the July 14, 2025 domestic violence trial at which plaintiff, his fiancée, C.B., and defendant testified. The parties were self-represented at trial.

Plaintiff and defendant had a dating relationship that ended in May or June 2024, and have a daughter, T.L., who was six years old at the time of the underlying act of domestic violence. The parties previously obtained temporary restraining orders (TRO) against each other based on an incident in August 2023 that involved "threats from both of [them] against each other." Those TROs were dismissed after the parties "worked it out."

During this appeal, the parties were engaged in ongoing litigation over custody of T.L., but shared parenting time pursuant to an order that awarded plaintiff parenting time from 3:00 p.m. on Friday until 8:00 a.m. on Monday each week. Prior to June 20, 2025, plaintiff picked T.L. up from her school near defendant's home in Marlton on Fridays and returned her to school on Monday mornings. On Friday, June 20, defendant scheduled a doctor's appointment for

---

[1] We use initials to protect the privacy of victims or alleged victims of domestic violence. R. 1:38-3(d)(10).

T.L. in Philadelphia at 2:15 p.m. Plaintiff did not attend the appointment and was not able to exercise parenting time with T.L. at 3:00 p.m. as a result.

Plaintiff testified he "contacted [defendant]" and "said . . . after the appointment give [him] a call" to "schedule drop off." Plaintiff "did[ not] know what time she was going to come" and "around [3:00 p.m.]" he and C.B. left his home in Trenton and went to a restaurant in Burlington. Plaintiff then "contacted [his] cousin" who lived "in Willingboro which is around the corner from the restaurant" and asked if defendant could drop T.L. off at her house because he "tr[ied] to avoid any interaction with [defendant]." Plaintiff's cousin agreed and plaintiff "told [defendant] that she [could] drop off at [his] cousin's house." Defendant "said she[ was] not going to do that" and was "going to . . . take [T.L.] to [the restaurant]."

At approximately "5[:00 p.m.], 5:30 [p.m.]" defendant called plaintiff "from [T.L.'s] iPad" and said she was "pulling up" to the restaurant. Defendant "came yelling and causing a disruption" and plaintiff "told [C.B.] to record it." Defendant was "yelling and screaming obscenities" and "being abusive toward[] [C.B.]." Defendant "got up on [them] and . . . was recording as well with [T.L.] with her." Plaintiff "g[ot] up" to "shield everything" because defendant "started to stand over [C.B.] . . . she[ was] standing over the table yelling at [them]."

3

A-0359-25

Plaintiff "was trying to get in between [defendant and C.B.]" to "diffuse the situation" and "protect [his] daughter."

Plaintiff "called the police . . . and [defendant] left." He then went to the police station and obtained a TRO. Plaintiff testified he was seeking an FRO "[b]ecause [he was] tired of the harassment" and defendant was "doing everything to torment [him] as she[ has] done in the past." He "just [did] not want to be bothered" and "need[ed] protection from her."

C.B. testified defendant entered the restaurant with T.L. and was "in [plaintiff's] face while he[ was] sitting down" "saying to him . . . [he] did[ not] come to [his] daughter's [doctor's] appointment" and "a bunch of other stuff." Defendant was "[v]ery aggressive" and "[v]ery loud."

C.B. began recording defendant with her phone "because [defendant] came in with a tripod" with a camera and was "trying to record the situation with her own camera." The video C.B. recorded with her phone was admitted as evidence and played for the judge at trial.[2] C.B. alleged defendant asked why she was "recording [her]" and "tried to snatch [her] phone out of [her] hand." Defendant was "snatching [her] phone and kind of pulling [C.B.], so [she] got up." Defendant "[a]gressively" asked C.B. "what [she was] going to do?"

---

[2] The video is not included in the appellate record. Our understanding of the content of the video is based on the trial transcript and the judge's description of the video.

A-0359-25

C.B. testified defendant "tried to snatch" T.L. "aggressively" and "said [she was going to] take [her] daughter," but T.L. "hid behind her father." Defendant asked T.L. if she "want[ed] to come with [her]" and T.L. said "no" and stood "behind [plaintiff] as if she was hiding." As defendant was "walking away she" told C.B. she would "see [her] again" and was "gonna get [her]."

Defendant testified "[her] understanding" was plaintiff "was going to come to [T.L.'s] appointment and leave with her" and "never knew that [she] had to drop her off somewhere else." Defendant was aware plaintiff made arrangements for her to drop T.L. at his cousin's house but was "not comfortable bringing" her there because plaintiff's cousin was at work and T.L. would have been unsupervised.

Defendant denied plaintiff's allegations regarding the incident in the restaurant. According to defendant, she entered the restaurant with T.L. and plaintiff "hug[ged] his daughter." Defendant then "approached the table and . . . said to him, is there a reason why you missed your daughter['s doctor's] appointment" and told plaintiff they "need[ed] to further discuss the things that [were] found out at her appointment." She testified C.B. "beg[an] recording [her]."

Plaintiff then "got up and got . . . belligerent and picked up his phone and [said he was] calling the police." Defendant said he did not "have to call the

A-0359-25

police" because "[t]his [was] a peaceful drop off." Defendant claimed she told plaintiff to "[j]ust make sure [he] pa[id his] child support payment and [they] need[ed] to talk about what was discussed at th[e] appointment, and [she] left." Defendant confirmed she recorded the interaction in the restaurant with her camera on "[her] tripod," but was unable to locate the recording. She conceded her recording was "basically [C.B.'s] video as well."

Following trial, the judge entered the FRO supported by an oral decision. She found plaintiff's testimony credible, noting it "was corroborated by [C.B.]" and the "video . . . corroborated his testimony as well." Applying the two-step analysis set forth in <u>Silver v. Silver</u>, 387 N.J. Super. 112, 125 (App. Div. 2006), the judge found defendant committed the predicate act of harassment, N.J.S.A. 2C:33-4(c).

The judge determined "when [defendant] found out that [plaintiff] was at the [restaurant,] she decided to go [there] to drop their child off and engage in a confrontation with . . . plaintiff and [C.B.]." The judge found C.B.'s video recording showed defendant

> ha[d] no self[-]control of any kind. She c[ame] to the restaurant. She ha[d] a camera in her own hand . . . to start recording th[e] incident because she[ was] going in there to make a scene. And she d[id] make a scene. And . . . it[is] clear that . . . plaintiff in the video [was] trying to get up. He[ was] trying to get in between . . . defendant and [C.B.]. He[ was] trying to somehow . . . deescalate the situation.

6

> And . . . defendant [went] in there not just to drop off the child, because [it was] not just here[ is] your daughter[.] . . . It [was] you[ are] not paying child support. It[ was] putting down [C.B.] . . . It[ was] anything but [she was] dropping off the child and . . . leaving because she [did not] leave. She [was] there to record and she [was] there to cause a problem.

Based on "[t]he content[] of what [defendant] said," "[t]he manner with which she came in," and "[h]er lack of self[-]control and the comments that she was making," the judge concluded defendant committed the predicate act of harassment by engaging in a "course of alarming conduct" that "serve[d] no legitimate purpose but to seriously annoy and[]or alarm . . . plaintiff."

Turning to the second prong of Silver, the judge found an FRO was necessary

> because of th[e] resentment that . . . defendant has towards . . . plaintiff [and] the fact that he has [a] fiancée that she[ is] clearly resentful about, her lack of self[-]control, the fact that they have a child together [and] there[ is] still an ongoing litigation with respect to the parenting time . . . under their FD docket.

The judge also determined "the person that suffered the most because of [defendant's] lack of control" was T.L. The judge observed "in the video [T.L.] . . . [was] standing there next to her father while this whole scene [was] taking place." "It was . . . very sad and unfortunate . . . to see [T.L.] as a result of [defendant's] lack of self[-]control . . . place[d] . . . in that predicament."

7

A-0359-25

Defendant subsequently retained counsel who moved for reconsideration arguing the incident "was more of a marital contretemps" and "there was no intent to annoy." Counsel argued "[i]t was a bad situation that [wa]s part of . . . a custody battle" and "did not rise to the level of a harassment or the necessity for" an FRO. Counsel also argued an FRO was unnecessary because there was no evidence plaintiff feared defendant.

On September 5, 2025, following oral argument, the judge entered an order denying the motion supported by an oral decision. The judge reiterated that defendant went to the restaurant "in a tirade . . . recording [plaintiff]" and "antagonizing him." Defendant "was there to belittle and make comments toward [C.B.]" and "to cause a scene" with "no legitimate purpose . . . but to annoy and[]or alarm . . . plaintiff."

The judge rejected defendant's claim that an FRO was not necessary because plaintiff "did not fear [defendant]." She stated "that alone is not the test. The test is whether or not without [the FRO] plaintiff would be exposed to further acts of harassment." The judge repeated her earlier findings that "given the conduct that took place . . . by a preponderance of the evidence . . . there was harassment" and, without the FRO, "plaintiff would be exposed to . . . future act[s] of domestic violence at the hands of . . . defendant."

A-0359-25

On appeal, defendant argues the "judge committed a legal error by failing to sufficiently set forth which of the statutory provisions . . . defendant . . . violated[] and . . . did not set forth findings sufficient to satisfy each element of" harassment. Specifically, defendant contends "plaintiff did not prove" defendant acted with a "purpose to harass" and "the court did not set forth findings establishing this required purpose." Defendant also argues plaintiff did not demonstrate the FRO was necessary to prevent future acts of abuse and the "judge . . . failed to adequately consider the factors a court must consider" when applying the second prong of Silver. Further, defendant argues the judge erred by denying her motion for reconsideration. We are not convinced.

Our review of an FRO issued after a bench trial is limited. C.C. v. J.A.H., 463 N.J. Super. 419, 428 (App. Div. 2020). In reviewing "a trial court's order entered following trial in a domestic violence matter, we grant substantial deference to the trial court's findings of fact and the legal conclusions based upon those findings." J.D. v. A.M.W., 475 N.J. Super. 306, 312-13 (App. Div. 2023) (quoting N.T.B. v. D.D.B., 442 N.J. Super. 205, 215 (App. Div. 2015)). This is so because Family Part judges, "routinely hear domestic violence cases and are 'specially trained to detect the difference between domestic violence and

more ordinary differences that arise.'" C.C., 463 N.J. Super. at 428 (quoting J.D. v. M.D.F., 207 N.J. 458, 482 (2011)).

"We defer to the credibility determinations made by the trial court because the trial judge 'hears the case, sees and observes the witnesses, and hears them testify,' affording it 'a better perspective than a reviewing court in evaluating the veracity of a witness.'" Gnall v. Gnall, 222 N.J. 414, 428 (2015) (quoting Cesare v. Cesare, 154 N.J. 394, 412 (1998)). We do not disturb a trial court's factual findings unless they are "so manifestly unsupported by or inconsistent with the competent, relevant[,] and reasonably credible evidence as to offend the interests of justice." S.D. v. M.J.R., 415 N.J. Super. 417, 429 (App. Div. 2010) (quoting Cesare, 154 N.J. at 412). However, we review de novo a trial judge's legal conclusions. C.C., 463 N.J. Super. at 429.

The entry of an FRO requires the Family Part judge to make certain findings. See Silver, 387 N.J. Super. at 125-27. "First, the judge must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19[(a)] has occurred." Id. at 125.

Second, the judge must determine "whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29[(a)](1) to 29[(a)](6), to protect the victim from an immediate danger or to

10

prevent further abuse." Id. at 127 (citing N.J.S.A. 2C:25-29(b)); see also J.D., 207 N.J. at 475-76. While the second prong inquiry "is most often perfunctory and self-evident, the guiding standard is whether a restraining order is necessary, upon an evaluation of the [applicable] factors . . . to protect the victim from an immediate danger or to prevent further abuse." Ibid. (citing N.J.S.A. 2C:25-29(b)).

This determination requires evaluation of:

> (1) The previous history of domestic violence between the plaintiff and defendant, including threats, harassment and physical abuse;
>
> (2) The existence of immediate danger to person or property;
>
> (3) The financial circumstances of the plaintiff and defendant;
>
> (4) The best interests of the victim and any child;
>
> (5) In determining custody and parenting time the protection of the victim's safety; and
>
> (6) The existence of a verifiable order of protection from another jurisdiction. . . .
>
> [N.J.S.A. 2C:25-29(a).]

Here, the judge found defendant committed the predicate act of harassment, N.J.S.A. 2C:33-4(c). A person is guilty of harassment if, "with purpose to harass another," he or she "[e]ngages in any . . . course of alarming

11

conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person." N.J.S.A. 2C:33-4(c).

For a finding of harassment under N.J.S.A. 2C:33-4, the actor must have the purpose to harass. Corrente v. Corrente, 281 N.J. Super. 243, 249 (App. Div. 1995) (citing D.C. v. T.H., 269 N.J. Super. 458, 461-62 (App. Div. 1994)). A finding that a party had the purpose to harass must be supported by "some evidence that the actor's conscious object was to alarm or annoy; mere awareness that someone might be alarmed or annoyed is insufficient." J.D., 207 N.J. at 487 (citing State v. Fuchs, 230 N.J. Super. 420, 428 (App. Div. 1989)).

A purpose to harass may be inferred from the evidence. State v. Hoffman, 149 N.J. 564, 577 (1997) (citing State v. McDougald, 120 N.J. 523, 566-67 (1990)); State v. Avena, 281 N.J. Super 327, 340 (App. Div. 1995). Common sense and experience may also inform a determination or finding of purpose. Hoffman, 149 N.J. at 577 (citing State v. Richards, 155 N.J. Super. 106, 118 (App. Div. 1978)). "[T]he decision about whether a particular series of events rises to the level of harassment or not is fact-sensitive." J.D., 207 N.J. at 484.

Pursuant to these principles, we affirm substantially for the reasons set forth in the judge's oral decisions. There is no basis for us to disturb the judge's factual findings or legal conclusions. The judge had the opportunity to hear and consider the testimony of the witnesses and assess their credibility. The judge

also considered the video evidence of defendant's conduct. The judge's factual findings are supported by sufficient credible evidence in the record, and those facts were correctly applied to the law.

Defendant's contention that plaintiff did not prove the predicate act of harassment lacks merit. The judge found harassment based on defendant's confrontation with plaintiff after she went to the restaurant "in a tirade" to "antagoniz[e]" plaintiff and "belittle" C.B. She found defendant did so with the purpose to harass plaintiff based on the nature of the conduct and the lack of any credible explanation for defendant's conduct other than that she intended to "seriously annoy and[]or alarm" plaintiff.

We also reject defendant's argument that plaintiff failed to meet his burden under the second Silver prong, demonstrating the need for an FRO to protect him and T.L. from further abuse. 378 N.J. Super. at 127. The record supports the judge's determination that plaintiff required the FRO.

As the judge found, defendant exhibited a lack of self-control and resentment toward plaintiff and C.B., which demonstrated the need for the FRO to prevent future acts of harassment. In addition, defendant engaged in the harassing conduct in the presence of her six-year-old daughter, causing the daughter to "suffer[] the most." As the judge additionally noted, the fact that the parties were engaged in "active litigation under their FD docket" further

13

supported the need for the FRO. Having reviewed the trial transcript, we are satisfied the evidence plaintiff presented supported the issuance of an FRO under the second Silver prong.

We are unpersuaded by defendant's claim that the judge erred by denying her motion for reconsideration. We review a judge's decision on a motion for reconsideration for abuse of discretion. Pitney Bowes Bank, Inc. v. ABC Caging Fulfillment, 440 N.J. Super. 378, 382 (App. Div. 2015). Under Rule 4:49-2, reconsideration should be granted only where (1) "the [c]ourt has expressed its decision based upon a palpably incorrect or irrational basis," or (2) "it is obvious that the [c]ourt either did not consider, or failed to appreciate the significance of probative, competent evidence." D'Atria v. D'Atria, 242 N.J. Super. 392, 401 (Ch. Div. 1990). "[A] motion for reconsideration provides the court, and not the litigant, with an opportunity to take a second bite at the apple to correct errors inherent in a prior ruling." Medina v. Pitta, 442 N.J. Super. 1, 18 (App. Div. 2015).

There is no reason for us to disturb the judge's denial of defendant's motion for reconsideration. The judge appropriately considered defendant's arguments in light of the applicable law and determined there was no basis to reconsider her decision to grant the FRO. Defendant raised the same arguments

14

the judge previously rejected and merely sought a second bite at the apple.  We are convinced defendant's motion was properly denied.

To the extent we have not addressed any remaining arguments, it is because they lack sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M. C. Hanley

Clerk of the Appellate Division